## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOANNE TRUDELLE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SMITH & WESSON HOLDING CORPORATION, MICHAEL F. GOLDEN, JOHN A. KELLY, and BARRY M. MONHEIT,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CIVIL ACTION NO.**

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff, Joanne Trudelle ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Smith & Wesson Holding Corp. ("Smith & Wesson" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of Smith & Wesson's securities between June 15, 2007 and December 6, 2007 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Smith & Wesson is the parent company of Smith & Wesson Corp., a manufacturer of firearms and firearm safety/security products, and a parent company of Thompson/Center Arms, Inc., a designer and manufacturer of firearm rifles.

3.      On October 29, 2007, the Company shocked investors when it announced its preliminary second quarter financial results, indicating therein that gross margins for the quarter would be lower than previously projected.  The Company stated that it had observed softness in certain product markets, low consumer demand, and "a buildup of pre-season retail inventories." The Company further announced that it expected sales of $325 million for fiscal 2008, lower than its previous projection of $330 million.  Additionally, the Company significantly lowered its earnings guidance for fiscal 2008 to $23.5 million, or $0.53 per share, compared to its previous guidance of between $28.5 million, or $0.63 per share.

4.      On this news, the Company's shares fell $7.97 per share, or 39.6 percent, to close on October 29, 2007 at $12.12 per share, on unusually heavy trading volume.

5.      Then on December 6, 2007, the Company further shocked investors when it announced its final second quarter financial and operational results, painting an even more dismal picture than was presented in its preliminary results for the quarter.  The Company disclosed that its reduced retail sales activities were "compounded by the fact that inventory in the channel was at an extremely high level," which had the effect of impacting product pricing in order to clear out built-up inventory.  Additionally, the Company further lowered its sales forecast for fiscal 2008, down to $300 million for the year against its previously reduced guidance of $325 million for the year.

6.      On this news, the Company's shares fell an additional $1.84 per share, or 20.6 percent, to close on December 7, 2007 at $7.08 per share, again on unusually heavy trading volume.

7.      The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being and prospects. Specifically, defendants failed to disclose or indicate the following:  (1) that the Company's reported sales figures were in fact inventory stocking transactions, as opposed to true representations of growth; (2) that the Company's subsequent quarterly sales would decrease as customers worked through overstocked inventory levels;  (3) that the Company had observed market saturation in various product lines, which would have the effect of customers postponing or reducing orders and purchases; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

8.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, Smith & Wesson's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13.     Plaintiff, Joanne Trudelle, as set forth in the accompanying certification, incorporated by reference herein, purchased Smith & Wesson's securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant Smith & Wesson is a Nevada corporation with its principal executive offices located at 2100 Roosevelt Ave., Springfield, Massachusetts.

15.     Defendant Michael F. Golden ("Golden") was, at all relevant times, the Company's President and Chief Executive Officer ("CEO").

16.     Defendant John A. Kelly ("Kelly") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Treasurer.

17.     Defendant Barry M. Monheit ("Monheit") was, at all relevant times, Chairman of the Company's Board of Directors.

18.     Defendants Golden, Kelly and Monheit are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Smith & Wesson's

reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Smith & Wesson is the parent company of Smith & Wesson Corp., a manufacturer of firearms and firearm safety/security products, and a parent company of Thompson/Center Arms, Inc., a designer and manufacturer of firearm rifles.

### Materially False and Misleading
### Statements Issued During the Class Period

20.     On June 14, 2007, the Company issued a press release entitled "Smith & Wesson Holding Corp. Posts Record Annual Revenues and Earnings."  Therein, the Company, in relevant part, stated:

> Smith & Wesson Holding Corporation (Nasdaq: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced financial results for the fiscal year and the fourth fiscal quarter ended April 30, 2007.

Net product sales for fiscal 2007 increased 48.8% over the previous fiscal year. Firearms sales for the fiscal year grew 50.1% over the previous fiscal year, reflecting a 59.7% increase in pistol sales, the full year financial impact of tactical rifle sales, and four months of revenue from Thompson/Center Arms ("Thompson/ Center"), which accounted for $22.5 million of revenue for fiscal 2007. Sales excluding the Thompson/Center acquisition grew at a rate of 34.5% for fiscal 2007.

Net income for fiscal 2007 of $13.0 million, or $.31 per diluted share, was $4.3 million, or $.09 per diluted share, higher than for the previous fiscal year.

Smith & Wesson Chairman of the Board, Barry M. Monheit, said, "Our results for fiscal 2007 reflect the tremendous execution of our business strategy by Mike Golden and his team. They have now delivered ten consecutive quarters of year-over-year, double digit sales growth in our core handgun business, and the recent acquisition of Thompson/Center, combined with the introduction of our new Smith & Wesson shotguns and bolt-action rifles, demonstrates that our diversification is successfully underway. The board of directors is excited with the progress this team has made, and we look forward to opportunities to build upon these successes in fiscal 2008."

Net product sales for the fourth fiscal quarter ended April 30, 2007 were a record $82.6 million, a 59.3% increase over fourth quarter fiscal 2006 net product sales of $51.9 million. Excluding Thompson/Center, sales grew at a rate of 22.3% for the fourth quarter. It should be noted that record sales for the fourth quarter of fiscal 2007 were achieved without the benefit of any revenue from federal government orders. Federal government orders for the fourth quarter of fiscal 2006 totaled $5.0 million. Thompson/Center generated approximately $19.2 million of net sales for the fourth quarter of fiscal 2007. Since the acquisition by Smith & Wesson on January 3, 2007, Thompson/Center has generated $22.5 million in net sales, representing a 21% increase over net sales for the same period one year ago.

Net income for the quarter was $5.2 million, or $0.12 per diluted share, compared with $4.2 million or $0.11 per diluted share, for the fourth quarter of fiscal 2006. The fourth quarter of fiscal 2007 included $1.5 million in cost of sales resulting from the write up to fair market value of the Thompson/Center inventory.

* * *

**Outlook for Fiscal 2008**

*We are raising our sales expectations for fiscal 2008 from $320 million to $330 million*, which would represent a 40.5% increase over fiscal 2007 sales. This increased sales expectation includes growth in our existing sporting goods channel and our continued penetration of the law enforcement and international markets. It also reflects a full fiscal year of impact from our Thompson/Center acquisition. The increased sales expectation does not include any significant revenue from federal government orders, nor does it include the results of any potential future diversification initiatives. The M&P pistol and tactical rifle series, along with our new shotgun and bolt-action rifle lines, are expected to be drivers in the sales increase for fiscal 2008.

*Net income for fiscal 2008 is anticipated to be $28.0 million, or $0.62 per diluted share, double the earnings per diluted share for fiscal 2007. Our increased expectation of $0.62 per diluted share in net income reflects an increase over our previously announced guidance of $0.60.* This increase is expected to result from higher expected sales volume, improvement in gross margin percentage to between 35% and 36%, a decline in operating expenses as a percentage of sales and licensing, and a full fiscal year of impact from our Thompson/Center acquisition. Because of the acquisition, the seasonality of the hunting segment will now be reflected in our quarterly results. Therefore, our first quarter (May through July) of fiscal 2008 will be our weakest quarter, while results in our second quarter (August through October), traditionally a strong quarter for hunting sales, will improve substantially over results for the second quarter of fiscal 2006. We began the year with a strong order backlog and as a result, we expect earnings for the first quarter of fiscal 2008 to now be $.09 per diluted share compared with $.08 per diluted share for the first quarter of fiscal 2007 and expect that the subsequent quarters through fiscal 2008 will increase more significantly on a year-over- year basis.  [Emphasis added.]

21.      On September 6, 2007, the Company issued a press release entitled "Smith & Wesson Corp. Posts Record First Quarter Revenues and Profits."   Therein, the Company, in relevant part, stated:

Smith & Wesson Holding Corporation (Nasdaq: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced financial results for its first fiscal quarter ended July 31, 2007.

*Record revenue of $74.4 million for the quarter ended July 31, 2007 reflects an increase of 56.3% over the comparable quarter last year. Revenue from the sale of firearms for the quarter ended July 31, 2007 grew 55.2% over the comparable quarter last year.* Excluding revenue from Thompson/Center Arms, a rifle maker we acquired in January 2007, revenue increased by 17.8% over the comparable quarter last year.

Net income for the quarter was $4.7 million, or $0.11 per diluted share, compared with $3.4 million, or $.08 per diluted share, for the comparable quarter last year.

*Smith & Wesson President and CEO Michael F. Golden said, "Our results for the first quarter of fiscal 2008 demonstrate progress across many initiatives and reflect growth in our core handgun business as well as our newly established long gun business.* Our sales growth was particularly strong given that the comparable quarter of the prior year included $5.2 million in U.S. government orders for Afghanistan that were not duplicated in the current quarter. Handgun sales into the retail channel increased by 41.0% for the quarter, driven by our direct sales force and a number of ongoing retail initiatives. We continued to penetrate the law enforcement channel in the first quarter. Our Military & Police (M&P) polymer pistols have a cumulative win rate of over 80% in all test and evaluation processes in which they have competed. The number of law enforcement agencies that have purchased or approved for carry our M&P pistol has now grown to 231, including recent wins at sizeable agencies such as the Hartford, Connecticut Police and the New Hampshire State Police."

\* \* \*

**Outlook for Fiscal 2008**

*We continue to expect revenue to increase to approximately $330 million in fiscal 2008, which would represent a 40% increase over fiscal 2007 revenue.* This revenue expectation does not include the results of any potential future, diversification initiatives, but does include growth in our existing consumer market, as well as continued penetration of the law enforcement, federal government, and international markets. Sales of our M&P pistols, M&P tactical rifles, our new shotguns and both of our new lines of hunting rifles are all expected to be key drivers of the revenue increase for fiscal 2008. We expect second quarter revenue to increase by approximately 60% over revenue in second quarter of fiscal 2007, driven by continued expansion in our

existing markets and the addition of revenue from Thompson/Center.

> ***We are increasing our expectations for fiscal 2008 net income to approximately $28.5 million, or $0.63 per diluted share, which is higher than our earlier expectation of $28.0 million, or $0.62 per share. These results would represent an increase of 119% over net income for fiscal 2007.*** While first quarter results were $0.02 per diluted share higher than our expectations, approximately one-half of this increase was due to timing on depreciation expense. Our capital expenditures for the first quarter were lower than anticipated, though we still expect to spend $17.7 million in fiscal 2008. We continue to expect gross margin improvement to the range of 35% to 36% for the full fiscal year, with second quarter gross margins of approximately 33%, reflecting the impact of the annual two week plant shutdown which occurs each August at our Springfield and Houlton facilities. The 33% gross margin reflects a 180 basis point increase over the second quarter of fiscal 2006. The seasonal nature of the hunting business will be reflected in higher marketing expenditures in the second quarter as a result of our increased advertising efforts during this peak buying period. We still expect operating expenses to be in the 20% to 21% range for the full fiscal year.  [Emphasis added.]

22.    The statements contained in ¶¶ 20 and 21 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's reported sales figures were in fact inventory stocking transactions, as opposed to true representations of growth; (2) that the Company's subsequent quarterly sales would decrease as customers worked through overstocked inventory levels;  (3) that the Company had observed market saturation in various product lines, which would have the effect of customers postponing or reducing orders and purchases; (4) that the Company lacked adequate internal and financial controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

### The Truth Begins to Emerge

23.     On October 29, 2007, the Company issued a press release entitled "Smith &

Wesson Holding Corp Announces Preliminary Second Quarter Financial Results."  Therein, the

Company, in relevant part, stated:

> Smith & Wesson Holding Corporation (Nasdaq: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced preliminary financial results for its second fiscal quarter which ends October 31, 2007.
>
> Based on preliminary financial data, the Company currently expects to report revenue for the second quarter of fiscal 2008 in the range of $69.0 million to $71.0 million compared with revenue of $50.8 million for the comparable quarter last fiscal year, reflecting revenue growth in the range of 36% to 40%. The Company expects to report earnings for the second quarter of fiscal 2008 in the range of $0.05 to $0.07 per fully diluted share, compared with earnings of $0.07 per fully diluted share for the comparable quarter last fiscal year. These results are preliminary in nature and subject to change based on the completion of the Company's normal quarter-end review process.
>
> ***Michael F. Golden, President and CEO of Smith & Wesson Holding Corporation, said, "While second quarter sales growth came in strong at 36% to 40%, our results were impacted by a combination of factors that emerged late in the quarter. Among these factors were softness in the market for hunting rifles and shotguns, driven by lower than expected consumer demand, a buildup of pre-season retail inventories, and unseasonably warm autumn weather, which decreased retail traffic and compressed the fall hunting season. Sales of our Thompson/Center Arms hunting rifles, which have a brand name that is already well-established in the consumer hunting market, appear to be far less impacted by these factors than are sales of new Smith & Wesson rifles and shotguns, which have only just begun to arrive in retail locations."***
>
> * * *
>
> ***Golden said, "We now expect revenue to increase to approximately $325 million in fiscal 2008, which is lower than our previous guidance of $330 million*** but which represents a 38% increase over fiscal 2007 revenue. This revenue expectation

does not include the results of any potential future diversification initiatives, but does include growth in our existing consumer market, as well as continued penetration of the law enforcement, federal government, and international markets. ***Due to the increased investment in consumer focused promotional programs, we now expect full fiscal 2008 gross margins of 33.5% to 34.5%, lower than our previous gross margin guidance of 35% to 36%***, but higher than fiscal 2007 gross margins of 32.3%. ***We now expect fiscal 2008 net income of approximately $23.5 million, or $0.53 per diluted share, which is lower than our earlier expectation of $28.5 million, or $0.63 per share***, but which represents an increase of 81% over net income for fiscal 2007. This reduction is attributable to the lower second quarter revenue results combined with the cost of the anticipated promotional programs." [Emphasis added.]

24. On this news, the Company's shares fell $7.97 per share, or 39.6 percent, to close on October 29, 2007 at $12.12 per share, on unusually heavy trading volume.

25. Then on December 6, 2007, the Company issued a press release entitled "Smith & Wesson Holding Corp. Posts Second Quarter Net Sales and Profits." Therein, the Company, in relevant part, stated:

Smith & Wesson Holding Corporation (Nasdaq: SWHC), parent company of Smith & Wesson Corp., the legendary 155-year old company in the global business of safety, security, protection and sport, today announced financial results for its second fiscal quarter ended October 31, 2007.

Net product sales for the quarter ended October 31, 2007 were $70.8 million, an increase of 39.4% over the comparable quarter last year. Gross margin increased to 32.3% for the quarter ended October 31, 2007 as compared to 31.2% for the same period last year. Net income of $2.9 million, or $0.07 per fully diluted share, for the quarter ended October 31, 2007 was $87,000 higher than the comparable quarter last year. Net income of $7.6 million, or $0.18 per fully diluted share, for the six months ended October 31, 2007 was $1.4 million, or $0.03 per fully diluted share higher than for the six months ended October 31, 2006. Net income for the second quarter of fiscal 2008 reflects a 54.5% year-over-year increase in operating expenses, combined with a $1.7 million year-over-year increase in interest expense, both attributable to the acquisition of Thompson/Center Arms in January 2007.

* * *

*As we announced last month, our results for the second quarter of fiscal 2008 in the consumer channel were impacted by a combination of factors, including softness in the market for hunting rifles and shotguns driven by lower than expected consumer demand, an industry-wide buildup of pre-season retail inventories, and unseasonably warm autumn weather, which compressed the fall hunting season. Within the consumer channel, the reduced retail activity not only affected long guns but handguns as well, and was compounded by the fact that inventory in the channel was at an extremely high level, due in part to the anticipation of a strong hunting season. In fact, during the first six months of calendar 2007, federal excise tax data indicates that industry-wide long gun sales into the distribution channel increased 20% year-over-year and handgun sales increased 37% year-over-year. However, federal background check data, which is an indicator of retail purchases, reflects that retail purchases for the same period of time increased by only 5.2%. The resulting, industry-wide inventory buildup, accentuated by lower retail traffic, caused order activity to slow beginning in October. Several manufacturers responded with significant discounts on both long guns and handguns. This caused increased price competition in the channel and served to exacerbate already inflated inventory levels.*

* * *

**Fiscal 2008 Outlook**

*We now expect net product sales to increase to approximately $300 million in fiscal 2008,* which would represent a 28% increase over fiscal 2007 net product sales. This expectation does not include the results of any potential future diversification initiative, but does include growth in our existing consumer market, as well as continued penetration of the law enforcement, federal government and international markets. We expect gross margins of approximately 32%, a reduction from our earlier expectations, reflecting increased promotional costs, an extended Springfield plant shutdown in December, and the lower absorption rate of overhead costs due to lower production volumes. We now expect net income for the fiscal year ending April 30, 2008 of approximately $17.0 million, or $0.40 per diluted share, which would represent an increase in net income of 33% over net income for fiscal 2007, and an increase in earnings of $0.09 per diluted share, or 29%, over the fiscal year ended April 30, 2007. [Emphasis added.]

26.     On this news, the Company's shares fell an additional $1.84 per share, or 20.6 percent, to close on December 7, 2007 at $7.08 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Smith & Wesson's securities between June 15, 2007 and December 6, 2007, inclusive (the "Class Period") and who were damaged thereby.   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Smith & Wesson's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Smith & Wesson, or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Smith & Wesson; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

33.     The market for Smith & Wesson's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements, and failures to disclose, Smith & Wesson's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Smith & Wesson's securities relying upon the integrity of the market price of Smith & Wesson's securities and market information relating to Smith & Wesson, and have been damaged thereby.

34.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Smith & Wesson's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

35.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Smith & Wesson's financial well-being and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Smith & Wesson and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

36.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

37.     During the Class Period, Plaintiff and the Class purchased Smith & Wesson's securities at artificially inflated prices and were damaged thereby.  The price of Smith & Wesson's securities significantly declined when the misrepresentations made to the market,

and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

38.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Smith & Wesson, their control over, and/or receipt and/or modification of Smith & Wesson's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Smith & Wesson, participated in the fraudulent scheme alleged herein.

39.     During the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 1,789,202 shares of the Company's stock for gross proceeds of $32,588,000, including over $6,120,000 in gross proceeds received by the Individual Defendants.   This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number of Shares | Price per Share | Gross Proceeds |
|---|---|---|---|---|
| October 1, 2007 | SALTZ, MITCHELL A | 145,000 | $18.50 - $19.11 | $2,727,000 |
| October 1, 2007 | MELBY, COLTON | 43,061 | $18.90 - $19.19 | $820,000 |
| October 1, 2007 | MELBY, COLTON | 128,017 | $18.66 - | $2,404,000 |

| | | | $18.89 | |
|---|---|---|---|---|
| October 1, 2007 | MELBY, COLTON | 78,922 | $18.35 - $18.66 | $1,460,000 |
| September 28, 2007 | SALTZ, MITCHELL A | 105,000 | $19.25 - $19.54 | $2,036,000 |
| September 18, 2007 | MONHEIT, BARRY M | 4,000 | $19.90 - $19.91 | $80,000 |
| September 18, 2007 | MONHEIT, BARRY M | 99,167 | $19.56 - $19.89 | $1,956,000 |
| September 18, 2007 | MONHEIT, BARRY M | 152,487 | $19.18 - $19.55 | $2,953,000 |
| September 14, 2007 | MONHEIT, BARRY M | 2,300 | $19.75 - $19.76 | $45,000 |
| September 13, 2007 | MONHEIT, BARRY M | 42,046 | $19.75 - $20.25 | $841,000 |
| August 9, 2007 | TAYLOR, THOMAS L | 33,334 | $22.00 – $22.05 | $734,000 |
| August 8, 2007 | CHANDLER, KENNETH W | 23,551 | $20.00 | $471,000 |
| August 7, 2007 | CHANDLER, KENNETH W | 11,449 | $20.00 | $229,000 |
| August 7, 2007 | TAYLOR, THOMAS L | 8,300 | $20.00 | $166,000 |
| July 26, 2007 | MAKKIYA, ANN B | 11,666 | $17.51 | $204,000 |
| July 13, 2007 | CHANDLER, KENNETH W | 32,000 | $18.13 | $580,000 |
| July 13, 2007 | SALTZ, MITCHELL A | 13,000 | $17.80 - $18.00 | $233,000 |
| July 12, 2007 | MELBY, COLTON | 161,784 | $17.51 | $2,833,000 |
| July 12, 2007 | TAYLOR, THOMAS L | 39,966 | $18.00 - $18.08 | $721,000 |
| July 12, 2007 | SALTZ, MITCHELL A | 237,000 | $17.66 - $18.55 | $4,291,000 |
| July 11, 2007 | MELBY, COLTON | 88,216 | $17.50 | $1,544,000 |

| | | | | |
|---|---|---|---|---|
| June 28, 2007 | MAKKIYA, ANN B | 2,267 | $16.91 - $16.98 | $38,000 |
| June 26, 2007 | KELLY, JOHN A | 2,934 | $16.27 - $16.30 | $48,000 |
| June 26, 2007 | NICHOLS, LELAND A | 5,867 | $16.38 - $16.39 | $96,000 |
| June 26, 2007 | GOLDEN, MICHAEL F | 12,000 | $16.36 - $16.41 | $197,000 |
| June 26, 2007 | CHANDLER, KENNETH W | 2,934 | $16.40 - $16.41 | $48,000 |
| June 26, 2007 | TAYLOR, THOMAS L | 2,934 | $16.26 - $16.28 | $48,000 |
| June 15, 2007 | MELBY, COLTON | 100,000 | $16.00 | $1,600,000 |
| June 15, 2007 | SALTZ, MITCHELL A | 200,000 | $15.85 - $16.00 | $3,185,000 |
| | **TOTAL:** | **1,789,202** | | **$32,588,000** |

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

40.　　At all relevant times, the market for Smith & Wesson's securities was an efficient market for the following reasons, among others:

(a)　　Smith & Wesson's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)　　As a regulated issuer, Smith & Wesson filed periodic public reports with the SEC and the NASDAQ;

(c)　　Smith & Wesson regularly communicated with public investors via established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Smith & Wesson was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

41.     As a result of the foregoing, the market for Smith & Wesson's securities promptly digested current information regarding Smith & Wesson from all publicly-available sources and reflected such information in the price of Smith & Wesson's securities.   Under these circumstances, all purchasers of Smith & Wesson's securities during the Class Period suffered similar injury through their purchase of Smith & Wesson's securities at artificially inflated prices and a presumption of reliance applies.

## <u>NO SAFE HARBOR</u>

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Smith & Wesson who knew that those statements were false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

43.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Smith & Wesson's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

45.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Smith & Wesson's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

46.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Smith & Wesson's financial well-being  and prospects, as specified herein.

47.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Smith & Wesson's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Smith & Wesson and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Smith & Wesson's securities during the Class Period.

48.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information

about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

49.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Smith & Wesson's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

50.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Smith & Wesson's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Smith & Wesson's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Smith

& Wesson's securities during the Class Period at artificially high prices and were damaged thereby.

51.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Smith & Wesson was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Smith & Wesson securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

52.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

53.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     The Individual Defendants acted as controlling persons of Smith & Wesson within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the

Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

57.     As set forth above, Smith & Wesson and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven

at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.


## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: January 9, 2008                          Respectfully submitted,


                                        By:   /s/ David Pastor
                                              David Pastor (BBO #391000)
                                              **GILMAN AND PASTOR, LLP**
                                              225 Franklin Street, 16th Floor
                                              Boston, MA 02110
                                              (617) 742-9700
                                              (617) 742-9701 (fax)

                                              **SCHIFFRIN BARROWAY
                                              TOPAZ & KESSLER, LLP**
                                              Richard A. Maniskas
                                              D. Seamus Kaskela
                                              David M. Promisloff
                                              280 King of Prussia Road
                                              Radnor, PA 19087
                                              (610) 667-7706
                                              (610) 667-7056 (fax)

                                              **Attorneys for Plaintiff**